Argued July 9, affirmed July 29, 1959
MARSTON *v.* MYERS ET UX
342 P. 2d 1111

*W. C. Winslow*, Salem, argued the cause for appel-

lants. With him on the brief was Norman K. Winslow, Salem.

*George A. Rhoten,* Salem, argued the cause for respondent. With him on the brief was Joseph M. Devers, Salem.

Before McALLISTER, Chief Justice, and LUSK, SLOAN and MILLARD, Justices.

MILLARD, J. (Pro Tempore).

This is an appeal by defendants, Joseph I. Myers and Elsie G. Myers, his wife, from a decree of the Circuit Court of Marion County, providing that said defendants hold certain real property, hereinafter referred to as "the homestead" of Albert R. Myers, deceased, and the proceeds and income therefrom as trustees, decreeing plaintiff, Grace Marston, to be the owner of said realty; settling accounts of said defendants as trustees, fixing compensation of the receiver, denying that the "Turner Tract" was held in trust by the above-named defendants, and allowing plaintiff her costs and disbursements.

As and for their first assignment of error said defendants contend that the trial court erred in entering a decree in favor of plaintiff and in not entering a decree dismissing this suit. This contention is generally based upon lack of competent evidence establishing the issues tendered by the complaint and the alleged trust relationship. Plaintiff seeks to establish a trust by showing that a confidential relationship existed between plaintiff and these appealing defendants, particularly Joseph I. Myers, and that because of such confidential relationship and the duties undertaken thereby, a promise is implied in fact to perform the trust, and that defendants refused to perform, and

converted the trust property and the income and proceeds therefrom to their own use.

Since the cause is tried here anew, we are required to consider the entire record of the case. The transcript alone consists of 975 pages, and we shall therefore of necessity confine ourselves to conclusions as to the facts disclosed thereby.

This cause is first concerned with the affairs of Albert R. Myers, a single man. He was the oldest of eight living brothers and sisters who are named as parties in this suit. All were raised near the Upper Santiam river, the parents of the Myers children having come there about 1910. The record shows they were a tightly-knit unit as a family, and that they maintained this relationship even after some of them were married. It is significant that all of them, including Joseph I. Myers, in testifying, constantly referred to matters known in the family, although often they were unable to state who imparted the particular information to them. Joseph I. Myers testified that they were "somewhat" of a close family.

As an indication of family procedure and thought, it happened that the mother deeded her property to some of the children prior to her death so as to avoid probate and consequent expense, the grantees acting as trustees in disposing of her property, paying the debts and giving each child his or her share of the proceeds. We shall later refer to this distribution, since it appears that the plaintiff, Grace Marston, received the share that would have gone to Albert, then deceased, indicating that it seemed to be understood that plaintiff would be entitled to his share. It is noteworthy that Joseph I. Myers offered no objection to this procedure, although he asked for and received an exact accounting.

In the early 1940's Albert Myers became seriously ill, having developed a cancer. At that time he was the owner of four tracts of land, "the homestead", "the Chamberlain Place", "the Gillingham Place", and another 40-acre tract. Some of the premises were encumbered by two mortgages, one for the principal amount of $1,000 and another for $400 in favor of a widow woman.

Due to his illness, Albert was incurring expense and unable to meet his obligations, and being unable to care for himself, had gone to live with plaintiff. Mrs. Marston took care of him until his death, 17 or 19 months later. Having lost control of his bowels, he was a problem patient. The family advanced $35 per month to plaintiff for his medical and incidental expenses. He sought a loan from his brother Joseph I. Myers, known to the family as "Ike", and hereafter referred to by that name. The loan was at first refused, but eventually it was reconsidered and granted. As a result, Ike loaned Albert sufficient money to pay off these two mortgages and other incidental expenses, and to secure himself, took a mortgage back for $1,600, the sum of the advances. This mortgage, so far as we know, has never been completely satisfied of record.

At or about the same time Ike successfully importuned Albert to deed his property over to Grace Marston, the plaintiff herein. At this point a sharp conflict in the testimony begins to develop. Ike claims that the sole purpose of deeding to Grace was to put the property in her name as a protection to him so that in the event of non-payment there would be spared the expense of foreclosure and probate, which would, in effect, eat up the security. Plaintiff contends that was only part of it. She claims that Albert knew that

he was seriously ill, and that the property was put in her name with the intent that upon his death the property or sufficient thereof would be sold to pay his debts and the balance or remainder was to go to Grace, and that Ike and another brother, Gilbert D. Myers, also known as "Jake", was, according to Albert's instructions, to take care of such matters. Grace contends that all these matters were known to Ike at the time. Notwithstanding the divergence of views, we are satisfied, from the evidence, that plaintiff's version is correct. Further, the plaintiff was totally inexperienced in business matters and the method of procedure was in accord with business practices in the family. Also, the method of handling the mother's estate corroborates plaintiff's testimony. Further, there were other debts owed by Albert, which were not discharged at the time Ike received the $1,600 mortgage. We are of the opinion that all the brothers and sisters were quite clear in their understanding that plaintiff was to be the final beneficiary, despite Ike's protestations to the contrary.

The other debts referred to had to do, in part, first, with an amount of approximately $2,000 owed by Albert to his brother Aubrey G. Myers, known as "Tant". We are satisfied that all of the family knew of this debt, since it is not seriously contended that the amount was not owing. The other debt had to do with an advance made to Albert by the Murphy Timber Company. It appears that Albert, along with some of his brothers, had contracted to sell their timber to this company at $2.00 per thousand. Albert, on account of his illness, and need for money, went to the timber company and secured an advance of $950 as against future timber payments due him. While the company did not require it, Albert insisted and

did give the company what amounted to a receipt showing payment in full for his timber. It clearly appears from the testimony of representatives of the timber company that this transaction and the written evidence accompanying it did not in fact constitute a sale, but such receipt was only for security purposes.

The chief value of Albert's realty was to be found in this timber on his place. The timber company abandoned their timber contract, but of course, retained their purported receipt as security for their advance previously made. We are satisfied that Ike did not know of this advance when he took the mortgage from Albert, but we are equally satisfied that he knew this transaction was in fact only a loan, prior to acquiring the interest of the timber company in the manner hereinafter related.

Albert R. Myers died intestate on July 29, 1945. Thereafter Gilbert (Jake) and Ike, who were charged with looking after Grace's interest, as well as the payment of debts of decedent, commenced a course of procedure resulting in partial discharge of these obligations. A sale of the parcel known as the Gillingham tract was consummated to some person named Bayly for $400. In consummation of the prior understanding, plaintiff and her husband executed a deed to the purchaser, and the money was applied on Ike's mortgage. Ike then desired to purchase the tract referred to as the Chamberlain Place. Since he would then be looking after his own interest, he asked Gilbert to arrange this sale, and as a result, a price of $1,400 was agreed upon, and again, plaintiff, without making any objection, and in implicit confidence in her brothers, deeded this place to Ike and his wife. At this point Ike executed a partial satisfaction of his mortgage to the extent of $1,350, although he had

received $1,800. He now claims that Albert owed him for services rendered in taking care of Albert's business, some of which was claimed to have been incurred prior to the execution of the $1,600 mortgage. Since Ike felt that it was necessary that his advances be secured by the mortgage, it seems reasonable that he would have insisted that any money then owed him be also secured by the instrument.

Some time after the sale of the Chamberlain Place to Ike, another brother, Stephen, and his wife, decided they would log Albert's homestead. If Ike did not know of Albert's transaction with the Murphy Timber Company at the time his mortgage was executed, we are satisfied that he was aware of it at this time. At this point Ike called upon the Murphy Timber Company. There again is a sharp conflict in the testimony as to what transpired. Ike claimed that he bought the timber outright from the Murphy Timber Company. Harry Murphy, one of the owners of the timber company, related an entirely different story, from which we quote:

"Q Now tell us what was said and done at about May 1st of '46 and who did it and who said it. Tell us about that.

"A Well, Ike came into my office and he said he was an executor of Albert's estate and was going to clean it up and he said, 'Albert owes you some money,' and I said, 'Yes, I think in the neighborhood of $950.' He said, 'I want to get it cleaned up.' I said, 'You go on in and see Kennelly,' and he went in and saw Kennelly. They cleaned it up and the next thing I knew that you had paid the check for $950. What you got I didn't know, but you left and I think that is the last time I saw you. (Last remarks addressed to Joseph I. Myers)".

At the conclusion of this conversation Ike went in

to see Mr. Kennelly, who was an employee of the timber company, and paid the sum of $950 and received the original receipt, with an endorsement therein reciting that "For value received Murphy Timber Co. hereby sells the above timber to Ike Myers", all above the signature of Murphy Timber Company by E. J. Kennelly. However, in the lower left-hand corner of the writing and below this endorsement, these words were also written by Mr. Kennelly, "Paid in full." Despite the wording used, it is clear that Mr. Murphy never authorized any sale to Ike, as witness not only his testimony, but also the testimony of E. J. Kennelly to the same effect. We are satisfied that Ike Myers also knew that a sale was not intended but that the paper indicated only that Albert's debt had been paid, otherwise why the notation "Paid in full"?

After receiving this document, Ike Myers then went to the plaintiff and requested that she deed Albert's homestead to him, giving as a reason that he intended to log it and that in order to do so, it would be necessary that he purchase a tractor. Although he claimed to other members of the family that he was now the owner of the timber by virtue of purchase from the Murphy Timber Company, he did not at this time make any such representations to the plaintiff. Thinking that he was still acting in her interest, plaintiff, in complete reliance thereon, complied with his request and did deed the land in question to Ike Myers and his wife, who now claim the land and timber as their own.

It is claimed that the version of defendants Ike Myers and his wife, with relation to these transactions with the Murphy Timber Company should be accepted, because, in any event, the land and timber thereon was not worth more than the amount of money he

paid. We are of a contrary opinion. The evidence indicates that, while some of the timber, because of the poor grade, was at one time without any market value, the situation had changed and the price of timber was rapidly increasing in value. Further, the poorer grades were rapidly becoming marketable, and in any event, the timber on the homestead was then worth at least twice the amount of money invested by Ike Myers. Albert Myers valued the place between $5,000 and $10,000. Said defendant did not attempt to log the land or buy a tractor for such purpose, but proceeded to sell off the timber. From one sale alone he realized $16,078.51. He thereafter claimed all the proceeds of various sales and the land itself as his own. As some indication of the increasing value of timber, it appears that Ike purchased the Chamberlain Place for $1,400 and later in the same year, 1947, sold the timber for about $4,100.

It should be noted that all of the living brothers and sisters of the plaintiff, with the exception of Ike, have assigned their interest in the estate of Albert R. Myers, to her. It should be further noted that we are not here concerned with the title to the Chamberlain, Bayly or Turner tracts. These tracts and their history are only relevant with respect to any information that may be imparted in relation to the question of trust relationship with respect to that property referred to as Albert's homestead. Plaintiff is claiming that Joseph I. Myers obtained title thereto by virtue of a confidential relationship, which he breached, and hence should be held a trustee of the premises, income and proceeds thereof for the benefit of plaintiff, on the theory that a constructive trust arose by operation of law. In addition, plaintiff is claiming that a resulting trust arose in her favor upon the

execution and delivery of the deed of this land to Joseph I. Myers and wife, because of the absence of any consideration therefor.

■■ With reference to the last contention, it now is generally held that where the owner of property gratuitously transfers it to another without declaring any trust, a resulting trust does not arise. *Shipe v. Hillman,* 206 Or 556, 564, 292 P2d 123; 3 Scott, Law of Trusts, p 2164, § 404.1; Bogert, Law of Trusts (3d ed), p 304, § 73. It is quite clear, therefore, that the deed from plaintiff to defendants Joseph I. Myers and wife, conveying the homestead, did not operate to create a resulting trust in favor of the grantor, and we therefore reject this contention.

■ Having decided that there was not any resulting trust, did a constructive trust arise because of a confidential relationship between Ike Myers and plaintiff?

"A constructive trust, or, as it frequently is called, a trust ex maleficio, ex delicto, a trust de son tort, or an involuntary or implied trust is a trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, or by commission of wrong, or by any form of unconscionable conduct artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice." 54 Am Jur, Trusts, 167, § 218.

■ From *Hanscom v. Irwin,* 186 Or 541, 565, 566, 208 P2d 330, we take the following:

"The rule as thus stated in American Jurisprudence has the approval of the American Law In-

stitute (Restatement, Trusts, § 44(1), (b), § 45 (1), (b)); 4 Pomeroy's Eq. Jur. (5th ed.) 138, § 1056a; 3 Bogert, Trusts and Trustees, Part 1, pp. 219-222; and 1 Scott on Trusts, 253, § 44.2. See, also, 1 Perry on Trusts and Trustees, 297.

"As formulated in the Restatement, ibid, the rule reads:

'(1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, and the transferee refused to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if * * *

'(b) the transferee at the time of the transfer was in a confidential relation to the transferor * * *;'

"In the comment (1, b) it is said:

'* * * This is true even though at the time of the transfer the transferee intended to perform the oral trust, and even though he was not guilty of undue influence or other abuse of his confidential relation to the transferor in procuring the transfer. Such a confidential relation exists not only where there is a fiduciary relation such as exists between attorney and client, trustee and beneficiary, guardian and ward, and the like, but also where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor * * *.'

"The idea of 'restitution' and of the prevention of 'unjust enrichment' upon which this doctrine seems to be based may be found developed at some length by Professor Bogert in the pages of his work above cited. See, also, *Sinclair v. Purdy,* supra; *Hughes v. Helzer,* 182 Or. 205, 223, 185 P. (2d) 537; Restatement, Restitution, § 160. With-

out attempting to enlarge upon that phase of the matter, we think it sufficient to say that on a question of this kind, where competing reasons of apparently equal validity press for acceptance and have brought about diversity of decision among the courts, we are justified in following the lead of the American Law Institute and the other eminent authorities to which reference has been made. This is particularly true when it can be seen that to take the opposite course would result in the absolute denial of justice and of the opportunity to do justice in many cases. We therefore adopt as the law of this state in this class of cases the rule which we have quoted from the Restatement."

See, also, *Shipe v. Hillman,* supra, at p 568; *Fouchek v. Janicek,* 190 Or 251, 261, 225 P2d 783; *Tate v. Emery,* 139 Or 214, 220, 9 P2d 136; Pomeroy (5th ed) §§ 1052, 1053, 1056a, 1057b et seq.

In *Shipe v. Hillman,* supra, at page 568, this court has summarized the requirements of the rule we have adopted as set forth in the Restatement of Trusts, and which is as follows:

"1. The conveyance of land to another in trust with no writing, but only an oral agreement, to evidence the intent of the transferor to create a trust;

2. A confidential relationship existing between transferor and transferee at the time of the conveyance; and

3. A refusal of the transferee to perform the trust."

■■ While defendant argues to the contrary, we are of the opinion that the evidence, viewed in the light of the closeknit association of the family and their tendency to do business as a unit, the evident business experience of Ike, the total lack of business experience of the plaintiff, the instructions of decedent as

to how his property was to be handled, by whom and for what purpose, and the complete reliance of plaintiff in her brother does, clearly and convincingly, establish a trust for the use and benefit of plaintiff.

■■ Nevertheless, it is argued, in effect, that since plaintiff has alleged in her complaint that the deed was given to Ike Myers for plaintiff's benefit with an understanding to that effect, and since plaintiff has failed to produce any evidence of a direct promise on the part of Ike Myers to hold the premises for her benefit, plaintiff has, therefore, failed in her proof. In support of this, numerous citations are given to the effect that the proof must correspond with the allegations in the pleadings. We agree with this rule of law, but it is not controlling here for the reason that the evidence is such as to negative any conclusion other than that a promise or agreement on the part of Ike Myers to perform is to be implied from the circumstances of this case.

■ It is next contended that a trust arising by implication or operation of law must be derived only from conditions existing at the time of the conveyance and cannot be supplied from circumstances established by subsequent events. Again, we agree with this rule of law. *Shipe v. Hillman,* supra, at page 570. From this it is argued that there is insufficient evidence to establish a constructive trust. We hold to the contrary. Further subsequent events may be shown by way of explanation.

It is further contended that parol evidence cannot be received to prove that a deed absolute on its face was given in trust in the absence of fraud, accident or mistake, citing *Shipe v. Hillman,* supra, at page 571; *Martin v. Martin,* 43 Or 119, 123, 72 P 639. The

rule is not so restricted. There is also included as additional grounds breach of a confidential relationship, as will appear in *Shipe v. Hillman,* at the page cited. See, also, authorities above cited. In any event, this contention is laid to rest in *Hanscom v. Irwin,* supra, at page 560. In that case, breach of a confidential relationship was in issue and it was held that the use of the word "fraud" was not of controlling importance.

 It is also argued that, in any event, Ike Myers became the owner of the timber by virtue of purchase from Murphy Timber Company. We have already called attention to the fact that the original transaction between Albert R. Myers and this company did not result in a sale but was for security purposes only and that Ike Myers was aware of the situation prior to acquiring such interest. It is conceded in defendants' brief that in this state the rule is to the effect that once a mortgage always a mortgage. Apparently it is thought that this rule only applies to deeds. We assume it is unnecessary to cite authority to the effect that ownership of growing timber constitutes an interest in real property. Under such circumstances the form of the instrument becomes immaterial. *Umpqua Forest Industries v. Neenah-Oregon Land Company and Schaefer,* 188 Or 605, 613, 217 P2d 219. All Ike Myers ever acquired by this transaction was a lien or equitable mortgage securing the money then advanced. This may be shown by parol evidence. *Umpqua Forest Industries v. Neenah-Oregon Land Company and Schaefer,* supra.

In view of the above, we hold that a confidential relationship is established between Ike Myers and wife and plaintiff existing at the time of the deed to said defendants; that it was intended that the bene-

ficial interest was to be retained by said plaintiff and that there was an attempted conversion of the property, income and proceeds, determined as to the amount by the trial court, amounting to a refusal to perform that, which constituted a constructive trust for the use and benefit of plaintiff. In so finding, we do not base our conclusions on the mere fact, standing alone, that the parties were, in fact, related.

As the last assignment of error, it is contended that the court erred in requiring Joseph I. Myers and wife, as such trustees, to pay interest.

> "A trustee is not chargeable with interest on the trust funds, unless he has used them for his own profit, or invested them so as to produce interest, or suffered them to lie idle when they might have been invested, or needlessly delayed settlement and surrender of the property, or in some other way shown a want of diligence and good faith: *Martin v. Martin,* 43 Or. 119, 124 (72 Pac. 639)." *Fitchard v. Hirschberg's Estate,* 128 Or 317, 272 P 906, 274 P 505.

See, also, *Marshall v. Frazier,* 159 Or 491, 80 P2d 42, 81 P2d 132; *Collins v. Collins,* 168 Or 666, 126 P2d 512.

■ Further than that the burden of proving liability for interest on trust funds is on him who alleges the right. 90 CJS, Trusts, § 338, p 585. In this case, it appears that for a considerable time after receipt of the funds the money was placed by Ike Myers and wife in their joint savings account where the interest allowed was small and that thereafter they invested the money from time to time at 6% interest. But in this case there has been shown a want of diligence and good faith and, in effect, an attempted conversion. Under such circumstances, interest is properly charge-

able. 90 CJS, Trusts, 588, § 341 et seq. See, also, ORS 82.010; *Collins v. Collins,* supra, at p 674 [legal rate of 6% is proper]. Under the circumstances here disclosed, a demand is not required. 90 CJS, Trusts, 585, § 338.

Some comment has been made that the three living children of a brother, who passed away prior to the events complained of, have not been made parties, as required by an earlier opinion of this court in this case. See 201 Or 259, 270 P2d 147. This had to do with an earlier opinion of the trial court holding that there was a trust for the benefit of the estate. Upon the cause being remanded, plaintiff amended her complaint and a new trial resulted. The principal question here involved is not concerned with the invalidity of the deeds referred to, but with their legal effect. The missing heirs may still litigate their rights and, hence, we do not at this time hold them to be indispensable parties. The basic question here has to do with whether or not Ike Myers and wife were trustees for the use and benefit of plaintiff, and not with the question of whether or not plaintiff is a trustee for the benefit of Albert's estate.

In view of the conclusions reached, it follows that the decree of the trial court is in all things affirmed.